CV2-375 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-375-CV





SPICEWOOD DEVELOPMENT CORPORATION,



 APPELLANT


vs.





TEXAS WATER COMMISSION,



 APPELLEE




 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT



NO. 91-1797, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING



 






PER CURIAM


 Spicewood Development Corporation (SDC) appeals from the district court's order
affirming in part and reversing in part the Texas Water Commission's (the Commission) (1) order
in a rate proceeding. We will affirm the district court judgment.

 SDC is a small, privately owned, utility located in northwest Travis County that
provides sewer service to approximately six hundred residential customers, a country club, an
elementary school, and a church. SDC and Northwest Travis County Municipal Utility District
No. 2 (MUD #2) share the ownership and operation of two effluent holding ponds, transfer
facilities, and an irrigation system. (2) In December 1989, SDC filed a statement of change in rates
with the Commission. After the hearing, most customers received a rate increase; a few with
demonstrated higher or lower than average use received adjusted rates. SDC sued for judicial
review of the Commission's order in the district court of Travis County. The trial court affirmed
in part and reversed in part the Commission's order. On appeal, SDC contends in three points
of error that the trial court erred in affirming the Commission's final order with regard to rate
case expenses, amount of invested capital, and rate of return. (3)



Standard of Review


 SDC challenges certain of the Commissions's findings of fact as being unsupported
by substantial evidence and as being arbitrary and capricious. (4)


 

Substantial evidence (5)

 Substantial evidence exists if the evidence as a whole is such that reasonable minds
could have reached the same conclusion that the agency must have reached to justify its actions. 
Texas State Bd. of Dental Examiners v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied,
490 U.S. 1080 (1989); Suburban Util. Corp. v. Public Util. Comm'n, 652 S.W.2d 358, 364 (Tex.
1983). Although substantial evidence is more than a scintilla, the evidence may preponderate
against the agency's decision and still be substantial evidence. Texas Health Facilities Comm'n
v. Charter-Medical Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984); Lewis v. Metropolitan Sav.
& Loan Ass'n, 550 S.W.2d 11, 13 (Tex. 1977); City of League City v. Texas Water Comm'n, 777
S.W.2d 802, 805 (Tex. App.--Austin 1989, no writ). The court reviews the reasonableness of the
order, not its correctness. Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer, 662
S.W.2d 953, 956 (Tex. 1984); Prosper Indep. Sch. Dist. v. Central Educ. Agency, 798 S.W.2d
661, 665 n.1 (Tex. App.--Austin 1990, writ denied). The court may not substitute its judgment
for that of the agency. Public Util. Comm'n v. Gulf States Util. Co., 809 S.W.2d 201, 211 (Tex.
1991); Schlachter v. Railroad Comm'n, 825 S.W.2d 737, 739 (Tex. App.--Austin 1992, writ
denied). The Commission is the sole judge of the credibility of witnesses and the weight to be
given the evidence presented. Gerst v. Guardian Sav. & Loan Ass'n, 434 S.W.2d 113, 116 (Tex.
1968); Texas State Bd. of Dental Examiners v. Silagi, 766 S.W.2d 280, 283 (Tex. App.--El Paso
1989, writ denied). The Commission may accept or reject a witness's testimony in whole or in
part. Guardian Sav. & Loan, 434 S.W.2d at 116; Southern Union Gas Co. v. Railroad Comm'n,
692 S.W.2d 137, 141 (Tex. App.--Austin 1985, writ ref'd n.r.e.).



Arbitrary and capricious

 An agency's decision is arbitrary or results from an abuse of discretion if the
agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an
irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but
still reaches a completely unreasonable result. Gerst v. Nixon, 411 S.W.2d 350, 360 n.8 (Tex.
1966); City of El Paso v. Public Util. Comm'n, 839 S.W.2d 895, 903 (Tex. App.--Austin 1992,
writ granted); Consumer's Water, Inc. v. Public Util. Comm'n, 774 S.W.2d 719, 721 (Tex.
App.--Austin 1989, no writ). An agency decision can be supported by substantial evidence and
still be arbitrary and capricious. Charter Medical-Dallas, Inc., 665 S.W.2d at 454. Such a
circumstance, however, must be based on a due process violation or some unfair or unreasonable
conduct that "shocks the conscience." Silagi, 766 S.W.2d at 285.



Rate Case Expenses


 In point of error one, SDC complains that the trial court erred in affirming the
Commission's final order authorizing only the amount of $43,416 as reasonable and necessary rate
case expenses because such action was arbitrary, capricious, without foundation, and unsupported
by substantial evidence in the record.

 In fixing the rates for the utility, the Commission must fix the utility's overall
revenues at a level that will: "(1) permit the utility a reasonable opportunity to earn a reasonable
return on its invested capital used and useful in rendering service to the public over and above its
reasonable and necessary operating expenses; and (2) preserve the financial integrity of the
utility." Tex. Water Code Ann. § 13.183(a)(1), (2) (West Supp. 1993). The utility has the
burden of proof to show the reasonableness and necessity of its expenses. Id. at § 13.184(c)
(West 1988); Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n, 798 S.W.2d
560, 563 (Tex. 1990), cert. denied, 111 S. Ct. 1641 (1991).

 Bernie Erwin, staff auditor and accountant for the Commission, testified in his
prefiled testimony (6) that reasonable rate case expenses were $43,416, significantly less than SDC's
requested amount of $124,073. He testified that SDC filed its first rate increase application in
April 1988 and $42,238 was ultimately allowed for rate case expenses in that proceeding. (7) The
current filing came only seven months after the first. He testified that first-time rate cases are
normally more expensive that subsequent ones, however SDC's second one was projected to cost
more than its first one, which was a factor in his determination that the amount SDC requested
was excessive. He also testified that to lessen the impact of excessive rate case expenses, both
the Commission and the Public Utility Commission had previously limited the allowance for rate
case expenses to $2.00 per customer per month.

 Erwin amended his prefiled testimony to support a recovery of $112,000 in
expenses, based on his opinion (8) that the protestants made excessive discovery requests. (9) The
examiner proposed and the Commission found, however, that protestants did not propound
excessive discovery requests. With Erwin's assumption of excessive discovery removed, the
remaining evidence is the original (10) prefiled testimony that this was a subsequent rate case, and
thus should have been less expensive than SDC's first one; and the per-customer formula
precedent. The Commission was able to use this evidence and disregard conclusions based upon
the excessive discovery premise with which it disagreed. See Guardian Sav. & Loan, 434 S.W.2d
at 116; Southern Union Gas, 692 S.W.2d at 141 (agency may accept or reject testimony in whole
or part).

 SDC complains the amount found was arbitrary and capricious, and particularly
challenges the conclusion that the protestant's discovery requests were not burdensome and that
SDC unduly prolonged the hearing. The Commission found that SDC had consumed
approximately 50% more time at the hearing than the protestants. We regard this situation as
analogous to that of judging the credibility of witnesses because the written record does not always
reflect certain aspects of the live proceedings. The number of lines consumed in the record or
number of objections made may not adequately convey the actual time consumption or overall
tenor of the proceedings that lead to the conclusion that SDC consumed excessive time. We defer
to the fact finder's judgment on this finding.

 SDC further contends that the Commission applied non-statutory criteria in
determining the amount allowed for rate case expenses. SDC bases this contention on finding of
fact 11.f.(2).(e): "The Utility should realize that its rate case expenses must bear a reasonable
relation to the revenue requirement and size of the utility." The Commission, in finding 11.f.(2),
found that the utility personnel expended an excessive amount of time in preparing for this cause,
and, relative to that finding, that a final order in the prior rate case was issued on May 22, 1989;
the hearing lasted nine days despite the fact that all direct testimony was prefiled; the utility
consumed approximately 50% more time; and that the protestants' discovery requests were not
unduly broad or burdensome.

 SDC complains specifically that finding 11.f.(2).(e) ties the amount of rate case
expenses to the amount of the rate increase actually awarded. We disagree. The finding points
out two specific factors bearing on the reasonableness of the expenses and reiterates the
Commission's conclusions that SDC unduly escalated its costs by spending too much time in the
hearing. The Commission's finding on the amount of rate case expenses is supported by
substantial evidence and is not arbitrary or capricious. We overrule point of error one.



Total Capital Invested


 In its second point of error, SDC complains that the trial court erred in affirming
the Commission's finding concerning the total capital invested in the utility because this finding
is without the support of substantial evidence and is arbitrary and capricious under the record as
a whole. In finding of fact 13, the Commission established "plant in service" at a value of
$1,116,297, a figure which SDC contends is $274,480 less than it should be. "Plant in service"
is the utility property that is "used by and useful to" the utility. Tex. Water Code Ann. § 13.185
(West Supp. 1993). Only property that is "used and useful" may form the basis for the rate of
return on investment. Id. SDC complains of two specific items: (1) the amount allowed for an
irrigation system; and (2) disallowance of requested construction work in progress amounts
(CWIP).



Irrigation Equipment

 This complaint centers around the exclusion of 31% of an irrigation system (11) based
on a determination that it was not "used and useful." SDC's wastewater operation involves the
use of holding ponds and the use of golf course property for disposal of treated effluent. SDC's
theory was that, because it needed to use all of the golf course acreage for irrigation, all of the
course is "used and useful." Jorge Arroyo, the Commission's staff engineer, testified that, based
on SDC's authorized discharge, it needed only eighty-five acres for disposal of effluent. He
testified to the computations he used to figure the necessary acreage. He said that SDC used as
much acreage as it did because SDC failed to properly maintain holding ponds for use at their
required capacity. In his opinion, the ratepayers should not be paying for defective maintenance.

 SDC also states in its brief that Arroyo's analysis was the only one provided and
was defective. SDC, however, had the burden of proof. Coalition of Cities, 798 S.W.2d at 563. 
It must, therefore, do more than contend that the Commission failed to make its case because the
Commission did not have the burden of proof on the issue. Substantial evidence supports the
finding disallowing a percentage of the irrigation system.



Construction Work In Progress (CWIP)

 In point of error two, SDC also complains of the disallowance of a recovery of
$105,912 for CWIP. Although the Water Code provides for an allowance for CWIP, it is an
"exceptional form of rate relief" to be allowed only on a showing by "clear and convincing
evidence that the inclusion is in the ratepayers' best interest and is necessary to the financial
integrity of the utility." Tex. Water Code Ann. § 13.185(b) (West Supp. 1993) (emphasis added). 
Further, an allowance for CWIP may not be granted to the degree that a major project was
inefficiently or imprudently planned or managed. (12)

 The Commission denied CWIP because SDC requested recovery for design work
for a facility on which construction had not yet begun at the time of the hearing. James Grube,
an environmental engineer retained by protestants, testified that the plans had been approved since
December 1988, but construction had not begun. He identified a preliminary engineering report
prepared by the utility on a different facility than the one he had designed. Further, he testified
that the utility was investigating acquisition of a used sewage treatment plant as an alternative to
construction of a new plant.

 SDC claims that "unequivocal" testimony supports its position that the allowance
for CWIP is necessary for its financial integrity. One of SDC's witnesses, a utility consultant,
testified that the allowance was essential. But, Erwin, one of the Commission's witnesses, did
not unequivocally support SDC. His testimony was that it would normally have been part of the
process to test models to see if a failure to include CWIP would jeopardize the utility's financial
integrity, but he did not recall specific results in this case. SDC's evidence is not "clear and
convincing" in this area.

 SDC further contends that it was under a Commission-initiated court order to
construct a new sewage treatment plant. That SDC was under a court order to construct a new
plant, however, does not mean that these particular designs are part of a project that is, or ever
will be, used and useful to the ratepayers, much less meet the standards for CWIP. We overrule
point of error two.



Rate of Return


 In its third point of error, SDC complains that the trial court erred in affirming the
Commission's final order adopting a permissible rate of return for the utility because the finding
was unsupported by substantial evidence and was arbitrary and capricious under the record as a
whole.

 No statute sets the rate of return; the regulatory body has wide discretion in
determining an appropriate rate. See Railroad Comm'n v. Entex, Inc., 599 S.W.2d 292, 294
(Tex. 1980); Southwestern Bell Tel. Co. v. Public Util. Comm'n, 571 S.W.2d 503, 511 (Tex.
1978). Determination of a utility's cost of equity, which is a critical component in establishing
the overall cost of capital, "is not an exact science." Railroad Comm'n v. Lone Star Gas Co., 611
S.W.2d 908, 911 (Tex. Civ. App.--Austin 1981, writ ref'd n.r.e.). The regulatory body is not
required to follow any particular method of determining cost of equity. See Public Util. Comm'n
v. GTE-SW, 833 S.W.2d 153, 158 (Tex. App.--Austin 1992, writ granted). This court has
recognized that when the agency's figure for cost of equity falls within the range of relevant
evidence, substantial evidence supports the equity finding. See City of Alvin v. Public Util.
Comm'n, No. 3-92-459-CV, slip op. at 27-28 (Tex. App.--Austin Aug. 25, 1993, no writ h.);
GTE-SW, 833 S.W.2d at 159.

 SDC claims that the method of determining cost of equity proposed by its witness
is superior to that proposed by the Commission staff and ultimately adopted by the Commission. 
SDC's expert witness, Thomas Graves, testified that SDC has no publicly traded long-term debt
outstanding. It does not have access to public bond markets and has no Standard & Poor's or
Moody's bond rating. (13) SDC's common stock is not publicly traded and therefore has no
meaningful market price that could be used in a company-specific equity return determination. 
Graves analyzed the rate of return required by investors from a sample of publicly traded water
utility companies generally in the same business as SDC. He then determined the estimated cost
of equity for SDC by considering the risks of investment in SDC relative to the sample group. 
He selected twelve firms, but noted that there were significant differences in the comparable group
which makes investment in SDC riskier. However, in the absence of a group more similar to
SDC, he used this sample as a "conservative benchmark" for comparison.

 For determining the cost of equity of the members of the comparable group,
because each firm had market data available, he used the "discounted cash flow" model to estimate
the cost of equity. (14) From application of that model, he determined the cost of equity of the
members of the group to be in the range of 12 to 16 percent. He then detailed certain factors that
he thought made SDC significantly more risky as an investment: its small size, localized
operation, limited on growth because of its location in an already developed area, lack of public
trading in its stock, lack of access to long-term debt, and necessity to upgrade facilities. He next
stated that he believed the cost of equity to SDC to be greater than the indicated range of 12 to
16 percent, but could not suggest a way of quantifying that additional cost. Therefore, he stated
that he believed that the cost of equity of SDC should fall at the upper end of the indicated range,
or 15 percent.

 Graves criticized the Commission's use of a method to estimate the cost of equity
that relied on estimates of the historical spread between debt and equity because there was no
relevant data for water or sewer utilities in Texas. He criticized the Commission's use of the
yields on Moody's public utility bonds as a comparison because these companies were not water
or sewer utilities.

 Erwin, the Commission's witness, testified that he used the bond yield averages for
public utility bonds with Baa ratings published by Moody's in March 1990, which gave him a
figure of 10.06. He added three percentage points for the increased risk of investing in SDC. 
His figure of 13.06 falls within the range given by Graves. It is smaller than the one suggested
by Graves, but Graves also admitted he was unable to quantify the additional risk. Further,
Graves testified that the use of a variety of methods was desirable to cross check results. That
one witness disagrees with the methodology used does not invalidate the fact that the
recommendations came within the same range. Inasmuch as there is a significant degree of
judgment involved in trying to estimate SDC's needs because of the dearth of comparable utilities,
the finding is neither lacking in substantial evidence nor arbitrary and capricious.

 We overrule point of error three. We affirm the judgment of the trial court.


Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: November 3, 1993

Do Not Publish

1.   Effective September 1, 1993, the Texas Water Commission became the Texas Natural
Resource Conservation Commission. Act of July 30, 1991, 72d Leg., 1st C.S., ch. 3, art. 1,
sec. 1.001, 1991 Tex. Gen. Laws 4, 5.
2. [2]  Wastewater generated within SDC's service area is transmitted to the plant facilities for
treatment and transfer to a holding pond. The treated effluent is ultimately used for irrigation on
two golf courses. 
3. [3]  No party complains about the portion of the district court's order reversing the
Commission's action.
4. [4]  The Administrative Procedure and Texas Register Act (APTRA), formerly Tex. Rev. Civ.
Stat. Ann. art. 6252-13A (West. Supp. 1993) was nonsubstantively recodified into the
Government Code as the Administrative Procedure Act. Act of May 4, 1993, 73d Leg., R.S.,
ch. 268, sec. 1, §§ 2001.001-.902, 1993 Tex. Sess. Law Serv. 587, 737-54 (West) (to be codified
as Administrative Procedure Act, Tex. Gov't Code Ann. §§ 2001.902)(effective Sept. 1, 1993). 
Former APTRA sections 19(e)(5)("substantial evidence") and 19(e)(6)("arbitrary and capricious")
are now APA § 2001.174(2)(E), (F). Act of May 4, 1993, 73d Leg., R.S., ch. 268, sec. 1, §
2001.174(2)(E), (F), 1993 Tex. Sess. Law Serv. 587, 752 (West).
5. [5]  See generally Kerry McGrath, Substantial Evidence Review in Texas--Still Insubstantial After
All These Years, 44 Baylor Law Review 223 (1992).
6. [6]  The Commission may require parties to file written direct and rebuttal testimony before the
hearing in order to reduce the time and expense required for conducting the hearing. 31 Tex.
Admin. Code Ann. § 265.8 (1989).
7. [7]  This amount was amortized over three years, the expected amount of time before another
rate increase request and hearing. The amount recommended in the current hearing is also to be
amortized over three years.
8. [8]  Erwin made this decision in conjunction with his supervisor. During the hearing, the
protestants' attorney raised a question regarding the amended amount, because it would appear
as a separately identified line-item surcharge. He suggested that the Commission staff was trying
to coerce settlement. 
9. [9]  The protestants were customers of SDC, represented by the Spicewood Neighborhood
Group.
10. [10]  The examiner noted specifically that he was not striking any testimony from the record.
11. [11]  Although difficult to determine from the briefs and record, the only disallowed portion of
the "irrigation system" appears to be the golf course acreage.
12. [12]  Compare this CWIP provision to the one in the Public Utility Regulatory Act (PURA): 
"The inclusion of construction work in progress is an exceptional form of rate relief to be granted
only upon the demonstration by the utility that such inclusion is necessary to the financial integrity
of the utility." Tex. Rev. Civ. Stat. Ann. art. 1446c, § 41(a) (West Supp. 1993). CWIP is not
to be included to the extent that major projects have been "inefficiently or imprudently" planned
or managed. Id. This court has recently decided that, under PURA, "exceptional circumstances"
is an independent threshold test that must be satisfied before CWIP can be authorized. See State
v. Office of Public Util. Counsel, 849 S.W.2d 864, 867-69 (Tex. App.--Austin 1993, writ
requested).
13. [13]  "Bond rating" refers to the system of evaluating and appraising the investment value of 
individual bond issues. Triple A bonds have the highest rating. Black's Law Dictionary 181 (6th
ed. 1990). Standard & Poor's and Moody's are two of the major bond rating services that make
these evaluations. 
14. [14]  The "discounted cash flow" model is based on the premise that the current market price of
common stock is a function of near-term dividend yield and long-term dividend growth.